**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

CIVIL ACTION NO. 18-12-DLB-CJS

SALLY HALL                                                          PLAINTIFF


v.                    <u>**MEMORANDUM OPINION AND ORDER**</u>


RAG-O-RAMA, LLC                                              DEFENDANT

＊ ＊　＊ ＊　＊ ＊　＊ ＊　＊ ＊　＊ ＊　＊ ＊　＊ ＊

This matter is before the Court on Defendant's Motion for Summary Judgment.[1] (Doc. # 53).  The Motion has been fully briefed, (Docs. # 64 and # 71), and is now ripe for the Court's review.  For the reasons set forth herein, the Motion for Summary Judgment is **granted in part** and **denied in part**.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This case arises from the termination of Plaintiff Sally Hall from her employment with Defendant Rag-O-Rama, LLC ("ROR") in January of 2017.  *See generally* (Doc. # 6). Hall was previously employed by ROR from 1999 to 2003.  (Doc. # 64-1 at 2).  Hall claims that Vance Whitener, the CEO of ROR, later recruited her to return to ROR.  (Doc. # 52 at 22:7–18, 31:24–32:11).  While living in Kentucky and working simultaneously for Elizabeth Cole Jewelry ("ECJ"), Hall accepted a position to work for ROR as a part-time

---

[1]      Also pending before the Court is a Motion for Attorneys' Fees (Doc. # 54), which will be adjudicated in a separate, subsequent order.

Trainer on August 21, 2015.[2]  (Docs. # 52 at 29:20–30:3 and # 64-1 at 2).  Hall was paid $18,000 and received health-insurance benefits for her part-time work at ROR.  *Id.*; *see also* (Doc. # 52 at 31:7–15).  As a part-time Trainer, Hall made "occasional trips to the Columbus [Ohio] store."  (Doc. # 64-1 at 2); *see also* (Doc. # 65 at 109:17–20) (Whitener explaining that his expectations were for Hall to be in Columbus for whatever time "it took to get everybody trained up").  In June of 2016, Hall left her position with ECJ and accepted a full-time position with ROR as an Area Manager.  (Docs. # 13-1 at 3 and # 52 at 13:18–19, 15:21–24); *see also* (Doc. # 6 at ¶¶ 9, 11).  Hall served as Area Manager for ROR from June 13, 2016 until she was terminated on January 10, 2017.  (Doc. # 13-1 at 3).

Whitener claims that he was reluctant to hire Hall for either position at ROR because she would be working remotely from her home in Falmouth, Kentucky.  (Doc. # 65 at 106:11–17, 107:20–108:9).  He also claims that Hall's performance as a Trainer was lacking, which made him additionally hesitant to hire her for a larger role.  *Id.* at 116:13–117:14.  Hall disputes this, however, claiming that Whitener initially "was begging and doing whatever he could to persuade her" to come back to work for ROR when she was hired as a part-time Trainer, (Doc. # 64 at 3), indicated that "he was extremely pleased with [Hall's] part-time efforts,"  (Doc. # 64-1 at 2), and "persuaded [her] to leave [ECJ] and come back to Rag-O-Rama full time,"  (Doc. # 52 at 15:23–24).

Hall claims that Whitener also made a number of promises to entice her to accept the full-time Area Manager position with ROR.  (Doc. # 64-1 at 3).  In addition to the salary

---

[2]     Hall was making $26 an hour while working for ECJ and received no benefits.  (Doc. # 52 at 14:23–15:10).  She did not inform ECJ that she took a part-time job working for ROR.  *Id.* at 31:16–21).

and other benefits listed in her employment agreement, she claims Whitener promised her a $5000 payment for design work she completed for ROR during her initial employment with the company (between 1999 and 2003), *id.*, and a company car "once [she] was able to take on more than the Columbus store," (Doc. # 52 at 37:13–19). She also claims that it was promised that she would oversee the franchising of ROR and receive some sort of ownership interest in ROR once the company was franchised. (Doc. # 52 at 35:1–11) (explaining that she was not going to be an owner of a franchise, but a part-owner of the ROR company); (Doc. # 64-1 at 3) (explaining that she "would be co-owner with him in those franchises"). Finally, Hall claims that Whitener promised she would be made executor of his will. (Doc. # 52 at 37:13–19); (Doc. # 64-1 at 3). Hall also believed that, under her employment agreement, she would be "guaranteed one year's salary and benefits if terminated." (Doc. # 64-1 at 3).

Upon accepting the Area Manager position, Hall signed an employment agreement, labeled as a "Communication Form," which documented her pay and benefits as well as some of her responsibilities as an employee of ROR. *See* (Doc. # 52-1) (laying out benefits and explaining that Hall was "expected to work on average a 40+ hour work week" and "agree[d] to uphold all company policies as outlined in the Employee and Manager Handbooks . . . [and] to perform the Area Manager's job duties as outline[d] in the handbooks, training materials and by his/her supervisors."). *Id.* The Form also included reminders about the importance of confidentiality and about ROR's non-compete policy. *Id.* With regard to the non-compete policy, the Communication Form states:

> He/she is reminded of the non-competition clause guidelines, as well as, obligating associate managers and higher to one full year of employment on the management team at Rag-O-Rama. If the one full year is not met, any benefit, including but not limited to used PTO, will be reversed/paid

3

back to Rag-O-Rama.  If a manager separates from the company, they are prohibited from working for a direct competitor for two years.

*Id.*  The non-compete language in Hall's Communication Form, mirrored the language in the Communication Forms of other ROR managers.[3]  *See* (Doc. # 53-3) (Communication Forms promoting Phil Gasper to Associate Manager, Assistant Manager, and Store Manager which all indicate that as a manager he is obligated to "one full year of employment on the management team at Rag-O-Rama" and if he "separates from the company [he is] prohibited from working for a direct competitor for two years"); (Doc. # 53-4) (Communication Forms promoting Leigh Trainor, Danielle Hess, and Corey Montgomery to Assistant Manager positions, which include similar non-compete language).  Hall signed the Communication Form on June 14, 2016.  *Id.*

As an Area Manager, Hall's main responsibilities were to manage the ROR store in Columbus, Ohio and revise ROR's Employee Handbook and other training materials. (Docs. # 13-1 at 3 and # 65 at 117:15–21).  More specifically, all Area Managers at ROR are responsible for the following, among other things: working with and supervising store managers and assistant managers; store operations including hiring, training, and evaluations; executing major maintenance requests; reviewing the store schedules and floor plans; maintaining budgets; adhering to and upholding company policies; handling complaints; maintaining inventory; and working to maximize store sales.  (Doc. # 53-12). In addition, Hall had been given a list of specific issues that needed to be addressed at the Columbus store.  (Doc. # 53-11).  According to Hall, she primarily undertook her responsibility to manage the store "remotely by video feed and through email and

---

[3]     This includes Communications Forms that Hall signed to promote employees while she was Area Manager.  *See* (Docs. # 53-2 at 6 and # 53-3 at 1, 3, 5).

telephonic communications from her residence in Falmouth, Kentucky" but also "made occasional, planned and surprise visits to the Columbus, Ohio store."  (Doc. # 6 at ¶ 20).

Approximately ten weeks into her full-time employment as an Area Manager, Whitener completed Hall's three-month employment review.  (Doc. # 52-8).  Hall also completed a self-assessment of her own progress as Area Manager around the same time.  (Doc. # 52-7).  Hall did not see or discuss her three-month review with Whitener until after she completed her self-assessment.  *See* (Doc. # 65 at 144:21–145:5) (Whitener explaining during his deposition that he completed the three-month review on August 31 but did not deliver it to Hall until September 11).

The three-month review provided Hall with "some feedback and a plan to help [her] succeed in [her] position."  (Doc. # 52-8 at 1).  In fact, through the review Whitener gave quite a bit of feedback regarding Hall's work up to that point.  Many of his comments dealt with Hall's remote work.  For example, Whitener noted that Hall was "not available for the business needs as much as [he] would like," was hard to reach at times, and appeared to not be "watching the cameras as much as [she should]."  *Id.* at 1, 3.  He also stated that it would be "so beneficial to [Hall's] new team" if she could spend more time in the store and expressed concern that she was "still struggling to [run the Columbus store remotely] successfully."  *Id.* at 4–5.  Additionally, he stressed, among other things, the need for store schedules to be out three weeks in advance, for Hall to show progress on training employees, and for hiring to improve.  *Id.* at 2, 4.  He also, however, noted some positive aspects of Hall's work, including having the "Biggest Dollar Sale ever," setting up the new office and break room, and showing some improvement in her monitoring of the cameras and her availability.  *Id.* at 1, 4, 5.  Whitener delivered the three-month

employment review to Hall and she signed it on September 11, 2016.  (Docs. # 52 at 83:13–15 and # 65 at 144:21–145:2).

Prior to reviewing her three-month feedback with Whitener, Hall completed her own self-assessment of her work up to that point, which she emailed to Whitener on September 3, 2016.   (Doc. # 52-7).   Her self-assessment included a list of her achievements, under-achievements, places for improvements, and goals for her employment.  *Id.*  Hall's self-assessment, despite being completed before reviewing her three-month review with Whitener, included similar issues to those noted by Whitener. *Compare* (Doc. # 52-7), *with* (Doc. # 52-8).   For example, in her list of under-achievements Hall included: "learning opening/closing paperwork on new system" and "checking cameras and computers every morning."  (Doc. # 52-7).  For improvements she lists: "[w]atching the cameras more [f]requently," and "[b]eing readily available at all times to intercept any calls from store from home office."  *Id.*  Despite these similarities, Hall claimed during her deposition that she disagrees with many of Whitener's "opinion[s]" and statements in the three-month review.  (Doc. # 52 at 83–119) (Hall discussing the three-month review during her deposition); *see also id.* at 119:2–5 (when asked "So you agree that Vance asked you to improve in some specific areas as part of this three-month review?" Hall answered, "He definitely had opinions on these.").

On October 31, 2016, Whitener sent an email to Hall providing additional feedback. (Doc. # 52-11).  In his email, he explains how excited he is for Hall to eventually serve as Area Manager for the ROR stores in Georgia as well as the Columbus store and provided a list of tasks to "help[] [Hall] in the next step on being successful as an area manager." *Id.* at 1.  He explains that he would like Hall to start clocking in and out, both when she is

working in Columbus and at home, and fill out Daily Task Forms on days when she is working from home.  *Id.*  Whitener noted that "it is really important that [Hall] spend as much time as [she] can in Cbus" and again reiterated that Hall needs to get the schedules out in a timely manner, *id.*, both issues that Whitener had previously addressed, *compare id.*, *with* (Doc. # 53-8) (three-month review noting issues with the schedules and that it would be helpful if Hall spent more time in the Columbus store).

On January 10, 2017, Whitener provided additional feedback to Hall which was documented in a Personal Improvement Plan/Final Warning document ("PIP").  (Doc. # 52-12).  Whitener and Hall discussed the PIP over the phone the morning of January 10, 2017.  (Doc. # 52 at 133:21–25).  He then emailed a copy of the PIP to Hall for her signature around noon on the same day and offered to speak with Hall once she had a chance to read the hard copy of the PIP.  (Doc. # 52-13).  Hall claims that her cell phone service and email access were terminated by ROR on January 10, 2017, so she was unable to review the PIP.  (Doc. # 52 at 132:23–133:20, 137:5–6, 145:21); *see also* (Docs. # 64 at 12 and # 64-1 at 5).  A screenshot of Hall's phone, however, presumably taken to show the notification that she "Cannot Get Mail," shows an unread email from Vance Whitener sent at 12:27 p.m.  (Doc. # 52-14).  The subject-line of the email is "P.I.P.," the email includes an attachment, and the body of the email reads "Hello Sally, Please sign and send back.  I am available at 2pm today if you would like to discuss anything.  Thank you, Vance."  *Id.*

Hall's PIP parroted many of the issues Whitener had previously mentioned in the three-month review and his October 31 email including the following: that Hall's phone consistently cut out making it difficult to have a conversation with her, that Hall was

inconsistent in getting the schedule out three weeks in advance, that Hall tries to squeeze too much into a short period of time during her trips to the Columbus store which is stressful for the store management, and that Hall struggles to manage the store remotely and at times "seem[s] distracted and not really fully committed" as if she is still a part-time employee. *Compare* (Doc. # 52-8), *with* (Doc. # 52-12); *compare* (Doc. # 52-11), *with* (Doc. # 52-12). In the PIP Whitener relieved Hall of a number of her duties—including dealing with the computer system, making store schedules, and filling out weekly store reports—and requested that she "focus all of [her] time and energy inside the Columbus store" to "get the store back on track as quick as [she could]." (Doc. # 52-12 at 5). Hall refused to sign the PIP, however, *id.*; *see also* (Doc. # 52-15 at 1) (Text message from Hall to Whitener on January 10, 2017 at 12:35 p.m. which reads "I have proof and documentation that you're being deceitful regarding the state of the store and your communications with the staff and am not signing the PIP."), and was subsequently terminated, (Doc. # 13-1 at 3–4).

On January 10, 2018, Hall initiated this action in federal court on the basis of diversity jurisdiction. (Doc. # 1). She brings claims of fraudulent inducement, breach of contract, breach of fiduciary duty, tortious interference, violations of public policy, and infliction of emotional distress, among other things. (Doc. # 6 at ¶¶ 36–48). ROR previously moved to dismiss the case for lack of jurisdiction, (Doc. # 13), but that Motion was denied, (Doc. # 31). Defendant ROR now moves for summary judgment on all claims. (Doc. # 53).

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In order to show that a fact is or is not disputed a party must either (1) "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or (2) "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *Id.* at 56(c).  In essence, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323.

In other words, in a summary-judgment motion the moving party bears the burden of explaining the basis of the motion and pointing to "those portions of the record that establish the absence of a genuine issue of material fact."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323).  The nonmoving party must then "go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Id.* (citing FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324).  If the moving party has met its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).  A court will find that "[a] genuine issue of material fact exists when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Chao*, 285 F.3d at 424 (6th Cir. 2002); *see also Matsushita*, 475 U.S. at 586 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  If a genuine issue of material fact is found, summary judgment must be denied.  FED. R. CIV. P. 56(a).

When evaluating a motion for summary judgment the Court must view "the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).  Moreover, the Court may not make "credibility judgments" or "weigh[ ] . . . the evidence" before it.  *Id.* (quoting *Bennett*, 410 F.3d at 817); *see also id.* ("It is an error for the district court to resolve credibility issues against the nonmovant: 'In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case.'" (quoting *Ctr. For Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

### B.   Choice of Law

Federal courts in diversity cases apply the substantive law of the state in which the court sits, *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (discussing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)), including that state's choice-of-law rules, *Phelps v.*

*McClellan*, 30 F.3d 658, 661 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820 (6th Cir. 1990)).   Kentucky has different choice-of-law rules for cases that sound in tort versus those that sound in contract.  *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707 (E.D. Ky. 2013) (citing *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009)). For tort claims, Kentucky law will apply if there are any "significant contacts—not necessarily the most significant—with Kentucky."[4]  *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972); *see also Saleba*, 300 S.W.3d at 181; *Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 145 n.8 (Ky. 2009).   On the other hand, Kentucky law applies in contract cases when Kentucky meets "the 'most significant contacts' test, set forth in § 188 of the Restatement (Second) of Conflict Laws."[5]  *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 981 (E.D. Ky. 2016) (citing *Saleba*, 300 S.W.3d at 181).   In all cases, there is a "strong preference" for the law of the Commonwealth to apply to cases brought in Kentucky courts.  *Wells Fargo Fin. Leasing, Inc.*, 970 F. Supp. 2d at 707 (collecting

---

[4]     There is some suggestion "that Kentucky may have abandoned the 'any significant contact' test in tort cases for the 'most significant contact' test."  *Cutter v. Ethicon, Inc.*, 5:19-cv-443-DCR, 2020 WL 109809, at *4 n.4 (E.D. Ky. Jan. 9, 2020) (citing *Kirilenko v. Kirilenko*, 505 S.W.3d 766, 769 (Ky. 2016)).  It is "unclear, however, because *Kirilenko* was a divorce case that did not involve a tort claim" and "supports [the apparent principle that the most significant contact test is applied to tort claims] by citing to a *Saleba* footnote that explicitly endorses the 'any significant contact' test for choice of law determinations regarding tort claims."  *Id.* (citing *Saleba*, 200 S.W.3d at 182 n.2).

[5]     This section of the Restatement directs a Court to consider the following factors to determine which law applies to a contract "[i]n the absence of an effective choice of law by the parties": "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (AM. LAW INST. 1971).  The Restatement notes that the "contacts are to be evaluated according to the relative importance with respect to the particular issue" and often when a contract is negotiated and performed in the same state, that state's law will apply unless an exception in §§ 189–199, 203 of the Restatement apply.  *Id.*

CESSA

cases).

The parties do not appear to dispute that Kentucky law applies to the claims currently before the Court, *see generally* (Doc. # 53) (Defendant applying Kentucky law to the claims)[6]; (Doc. # 64) (Plaintiff applying Kentucky law to the claims), and the Court agrees that Kentucky law is appropriate here.  For the tort claims, Kentucky law applies because Hall is a resident of Kentucky and, therefore, the tort claims brought by Hall have a significant contact to Kentucky.  *Warndorf v. Otis Elevator Co.*, No. 2:17-cv-159-DLB-CJS, 2019 WL 137585, at *2 (E.D. Ky. Jan. 8, 2019) (Kentucky law governs tort claims brought in Kentucky when the plaintiff is a Kentucky resident) (citing *Aces High Coal Sales, Inc. v. Cmty. Tr. & Bank of W. Ga.*, No. 2:15-cv-161-DLB-HAI, 2017 WL 3122661, at *12 (E.D. Ky. July 21, 2017)).  While the test applied to contracts claims is less straightforward, the Court finds that Kentucky has the most significant contacts to the contract issues underlying Hall's claims.  Among other things, the alleged contract claims arise from an alleged agreement that was signed by Plaintiff in Kentucky for work to be completed by a Kentucky resident working primarily from Kentucky.  *Hall v. Rag-O-Rama, LLC*, 359 F. Supp. 3d 499, 506, 510 (E.D. Ky. 2019).  Moreover, ROR sent Hall office equipment—including a computer that had a remote connection to the security cameras in the Columbus, Ohio store—to allow her to complete her contractually-agreed-to duties from Kentucky.  *Id.*; (Doc. # 23-1 at 3); *see also* RESTATEMENT (SECOND) OF CONFLICT OF

---

[6]     At one point, ROR references Ohio law when discussing ownership of ROR and the unemployment insurance process in Ohio.  (Doc. # 53 at 30–31).  As ROR is an Ohio LLC, "the rights, duties and obligations" of it are governed by the laws of Ohio.  *Howell Contractors, Inc. v. Berlineg*, 383 S.W.3d 465, 467–68 (Ky. Ct. App. 2012) (citations omitted).  Obviously, Ohio's unemployment insurance benefits are also governed by Ohio law.  *Burns v. Dir., Ohio Dept. of Job & Family Servs.*, Nos. 2004-T0071, 2004-T-0072, 2005 WL 3150238 (Ohio Ct. App. Nov. 25, 2005) ("[I]n Ohio, unemployment compensation is a statutory scheme governed by [Ohio Revised Code] 4141.").

LAWS, § 188.  As a sister court in this District has done, "because the parties agree that Kentucky law should apply to the substantive claims and Kentucky appears to have the 'most significant contacts' to the facts underlying [Hall's] alleged injuries, the Court will apply Kentucky law to the substantive issues without belaboring the choice of law analysis." *Cutter*, 2020 WL 109809, at *4.

### C.   Plaintiff's Claims

Plaintiff Hall raises a number of claims in her Amended Complaint.  (Doc. # 6 at ¶¶ 36–48).  While she lists 13 allegations about ROR's conduct, *see id.*, in some of her allegations Hall is not specific about the nature of the claim she is attempting to bring, *see, e.g.*, *id.* at ¶ 45 (alleging that "Rag-O-Rama's conduct and termination of Hall was done with oppression, fraud, malice, and reckless indifference, and otherwise in bad faith, for which it is liable in tort."); *id.* at ¶ 48 (alleging that "Rag-O-Rama's conduct and termination of Hall was intentional, negligent, grossly negligent, unlawful and a violation of both contract and tort principles, and caused her to suffer and continue to suffer financial and emotional damages.").  The Court has done its best to decipher her vague claims and will address each apparent claim in turn.[7]  In some instances, in the interest of clarity and efficiency, the Court will address related claims together.[8]

---

[7]     The Court previously indicated that Hall brought "a number of common-law claims . . . including wrongful termination, breach of her employment contract, tortious interference with a business relationship, intentional and/or negligent infliction of emotional distress, and fraudulent inducement." *Hall*, 359 F. Supp. 3d at 502 (citing (Doc. # 6)); *see also id.* at 504 (citing (Doc. # 6) ("In her Amended Complaint, Plaintiff brings claims for wrongful discharge, breach of contract, breach of fiduciary duty, breach of warranty, fraudulent inducement, tortious interference with a contractual relationship, and negligent and/or intentional infliction of emotional distress.").  Review of the summary-judgment briefing has somewhat clarified the claims being presented; accordingly, and out of an abundance of caution, the Court will analyze claims beyond those mentioned in the Court's prior Memorandum Opinion and Order.

[8]     At the outset of her response brief, Hall seems to claim that there are discovery issues surrounding the Motion for Summary Judgment.  (Doc. # 64 at 2).  Specifically, Hall takes issue

It should also be noted at the outset, that many of Plaintiff's arguments lack both legal and factual support. "A party may not present a skeletal argument, leaving the court to put flesh on its bones." *Davis v. Detroit Downtown Dev. Auth.s*, 782 F. App'x 455, 458 (6th Cir. 2019) (citing *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016)). Unfortunately, as to many claims as explained below, Hall has done just that.

### 1.   *Breach of Contract*

Hall's first claim is one for breach of contract. (Doc. # 6 at ¶ 36). She specifically argues that there was an employment contract between her and ROR[9] which "includes an itemization of pay and benefits along with a one-year term of employment and a two-year non-compete agreement (both without end dates)." (Doc. # 64 at 15). She claims that contract was violated when ROR "terminated her pay and benefits a little over six months [after the agreement was signed] despite the one-year stated in the contract." *Id.* at 16. Alternatively, she also seems to claim that the contract guaranteed her "a year . . . of pay after leaving the company." (Doc. # 52 at 41:16–21). She claims that this language meant that if she got fired from ROR she would be paid "for one year . . . [b]ecause I was doing a two year non-compete clause." *Id.* at 42:4–7. Hall explained during her deposition that, even though the Form does not include language "obligating

---

with ROR's errata sheets for the deposition testimony and other apparent efforts—though "amended discovery responses," new discovery, and new declarations—to "change and add testimony after its depositions." (Doc. # 64 at 2 nn.1–2). Though it is not completely clear what documents she is referring to, as far as the Court can tell, none of the documents Hall claims are being used to "change . . . testimony" were used by the Court in reaching its decision. Rather, to the extent the Court relied on the depositions of Whitener and Jorge Maymo, Vice President of ROR, it only considered the original testimony and not the errata sheets. Additionally, the Court does not rely on the facts as explained in the Defendant's new declarations, but rather only on the documents attached therein. Thus, this issue is moot.

9       Hall appears to suggest that the Communication Form, (Doc. # 52-1), is the contract between ROR and Hall, *see* (Doc. # 64 at 6).

Rag-O-Rama to pay [Hall] after [she left]," she and Whitener had "multiple discussions" about that agreement which she "believe[s]" is "reflected in" the Communication Form.[10] *Id.* at 44:6–15. ROR argues, however, that Hall was an at-will employee; even if the Communication Form constitutes a contract between Hall and ROR, Hall's interpretation of the Form goes against its plain language and ROR did not breach it. (Doc. # 53 at 1, 28–29).

In order to prevail on an action for breach of contract in Kentucky, three elements must be shown: (1) a contract exists, (2) the contract was breached, and (3) the plaintiff has suffered damages as a result of the breach of contract. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007)); *see also Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 886–87 (E.D. Ky. 2014) (quoting *Fifth Third Bank v. Lincoln Fin. Sec. Corp.*, 453 F. App'x 589, 601 (6th Cir. 2011)).

### a.    A Contract Exists Between Hall and ROR

Despite ROR's apparent suggestion to the contrary, (Doc. # 53 at 1, 28–29) (seeming to disclaim the existence of an employment contract between the parties), the

---

[10]    Hall appears to be somewhat confused about what she believes the contract language guarantees. In her deposition, she seems to suggest that ROR will guarantee her a year of pay after she leaves ROR. (Doc. # 52 at 41:16–21, 42:4–7). In her Amended Complaint and response to the summary-judgment Motion, however, she seems to suggest that the contract guaranteed her one year of employment with ROR including one year of salary. (Docs. # 6 at 4 and # 64 at 4). In fact, Hall seems to admit that there is an issue of fact here as to what exactly was guaranteed. (Doc. # 64 at 16 n.15). The fact that Hall suggests that her term of employment with ROR is indefinite, (Doc. # 52 at 54:3–14) (discussing language in Phil Gasper's Communication Form that is identical to the language in hers), seems to indicate that Hall believed the Communication Form guaranteed one year of pay after she left ROR, not a one-year employment contract, *see McNutt v. Mediplex of Ky., Inc.*, 836 F. Supp. 419, 421 (W.D. Ky. 1993) (finding that because the plaintiff testified that he believed his job was for an indefinite period of time, the "Defendant's statements and writings did not subjectively cause Plaintiff to believe that a one year contract was offered."). Out of an abundance of caution, however, the Court will address both apparent guarantees when addressing the breach-of-contract claim.

Court finds that a contract regarding the terms of Hall's employment does exist between Hall and ROR.  As every first year law student learns, a valid contract requires three things—"offer and acceptance, full and complete terms, and consideration."  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002).  "[U]nder Kentucky law, an enforceable contract must contain definite and certain terms setting forth promises of performance to be rendered by each party."  *Mullen v. Houston-Johnson, Inc.*, No. 2017-CA-001648-MR, 2019 WL 1224622, at *3 (Ky. Ct. App. Mar. 15, 2019) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).

Under Kentucky law an "employment contract" may be a term of art indicating that employment under the contract is not at-will.  Federal courts in Kentucky have explained that "[a]n employee may establish a contract for employment in either one of two ways.  First, an employer may offer employment for a definite period of time.   Second, an employer may offer employment for an indefinite period of time with a covenant not to terminate without cause."  *McNutt*, 836 F. Supp. at 420 (citing *Otis & Co. v. Power*, 1 Ky. Op. 312 (Ky. 1886); *Shah v. Am. Synthetic Rubber Corp*, 655 S.W.2d 289 (Ky. 1983)); *see also Suhail v. Univ. of the Cumberlands*, 107 F. Supp. 3d 748, 762 (E.D. Ky. 2015) (quoting *McNutt*, 835 F. Supp. at 420).  Such a contract for employment, however, only allows employers to "get around" the fact that the default employment status in Kentucky is at-will employment.  *Suhail*, 107 F. Supp. 3d at 762; *see also Vogel v. E.D. Bullard Co.*, 597 F. App'x 817, 820 (6th Cir. 2014) ("Generally, in the absence of a specific contractual provision to the contrary, employment in Kentucky is terminable at will, meaning that an employer may ordinarily discharge an employee 'for good cause, for no cause, or for a cause that some might view as morally indefensible.'" (quoting *Miracle v. Bell Cty.*

*Emergency Med. Servs.*, 237 S.W.3d 555, 558 (Ky. Ct. App. 2007)).  In other words, an employment contract in Kentucky allows parties to enter into "a contract for 'just cause' employment."  *Mayo v. Owen Healthcare, Inc.*, 229 F.3d 1152, 2000 WL 1234359 at *2 (6th Cir. 2000) (unpublished table decision) (citing *McNutt*, 836 F. Supp at 420).

### i.      The Communication Form Is a Contract

The Communication Form clearly indicates that Hall was offered the position of Area Manager which she accepted.  (Doc. # 52-1) (indicating that Hall accepted the position of Area Manager, which suggests that she was offered the position at some point prior).  The Form also evidences valid consideration in the form of Hall's salary and other benefits.  (Doc. # 52-1); *see also Univ. of Louisville v. Bohm*, No. 2017-CA-000935-MR, 2019 WL 1422912, at *4 (Ky. Ct. App. Mar. 29, 2019) (finding the elements of a valid contract in letters sent to the plaintiff by the University regarding his employment, including finding consideration in the form of plaintiff's salary and other benefits). Additionally, the Communication Form includes definite terms including, among other things, the monetary value of Hall's salary and benefits, which ROR was agreeing to provide in exchange for her services as Area Manager.  (Doc. # 52-1); *see also Zeltiq Aesthetics, Inc. v. Medshare, Inc.*, 3:14-cv-213-CRS, 2015 WL 3447612, at *2 (W.D. Ky. May 28, 2015) ("To satisfy the [definite and complete terms] element, 'the terms of a contract must be sufficiently complete and definite to enable the court to determine the measure of damages in the event of breach.'" (quoting *Kovacs*, 957 S.W.2d at 254)). Accordingly, the Court finds that there was a contract between the parties which codified the terms of Hall's employment.

### ii.    The Communication Form Is Not an Employment Contract

The Communication Form, however, is not an employment contract as Hall seems to argue.   Specifically, Hall seems to claim that she had a one-year contract of employment based on the language of the non-compete clause.  (Doc. # 64 at 15).  The Court disagrees.

When a contract is unambiguous, it "will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its own ordinary meaning and without resort to extrinsic evidence."  *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 783 (Ky. 2017) (internal quotations omitted) (quoting *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016)).  A contract will only be found to be ambiguous if "a reasonable person would find it susceptible to different or inconsistent interpretations."  *Id.* at 783–84 (quoting *Ky. Shakespeare Festival*, 490 S.W.3d at 694–95).  In other words, "[a] term may be found ambiguous when its meaning is susceptible to two or more reasonable interpretations."  *Encompass Indem. Co. v. Halfhill*, No. 5:12-cv-117-TBR, 2013 WL 6800682, at *3 (W.D. Ky. Dec. 20, 2013) (citing *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003)).  Additionally, "[t]he ambiguity must be . . . apparent on the face of the contract."  *Luttrell v. Cooper Indus., Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998) (citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)).

If ambiguity is found, then a court may consider extrinsic and parol evidence including "evidence of agreements between or the behavior of the parties prior to or contemporaneous with the contract . . . includ[ing] 'evidence of a contemporaneous oral agreement on the same subject matter, verifying, modifying, contradicting or enlarging' a

contract." *Id.* (quoting *M.R. Kopmeyer Co. v. Barnes*, 276 S.W.2d 21, 23–24 (Ky. 1955)). If the language of a contract is unambiguous, however, the Court must "determine the intention of the parties 'from the four corners of that instrument.'" *Superior Steel, Inc.*, 540 S.W.3d at 784 (quoting *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)); *see also Luttrell*, 60 F. Supp. 2d at 631 ("Barring an ambiguity, such [parol] evidence cannot be admitted."). "Additionally, if the language 'is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.'" *Ford v. Ratliff*, 183 S.W.3d 199, 203 (Ky. Ct. App. 2006) (quoting *Luttrell*, 60 F. Supp. 2d at 631); *Mitsui Sumitomo Ins. USA, Inc. v. Denham-Blythe Co.*, 375 F. Supp. 3d 788, 792 (E.D. Ky. 2019) (same). "The fact that a party may have intended different results is inadequate to 'construe a contract at variance with its plain and unambiguous terms." *Superior Steel, Inc.*, 540 S.W.3d at 784 (quoting *3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005)).

The Court finds that the language of the Communication Form is not ambiguous—in fact, Hall herself admits that the terms of the Communication Form are "clear." (Doc. # 64 at 15). Hall's breach-of-contract allegation arises from the following language regarding ROR's non-compete agreement:

> He/she is reminded of the non-competition clause guidelines, as well as, obligating associate managers and higher to one full year of employment on the management team at Rag-O-Rama. If the one full year is not met, any benefit, including but not limited to used PTO, will be reversed/paid back to Rag-O-Rama. If a manager separates from the company, they are prohibited from working for a direct competitor for two years.

(Doc. # 52-1). An ordinary reading of this language indicates that associate managers or

higher commit to working for ROR for one year[11]; if they do not work for ROR for at least one year, they may be required to pay back benefits to the company including paid time off. *Id.* Additionally, managers may not work for any of ROR's direct competitors for two years after leaving ROR. *Id.* In essence, the provision puts obligations on employees of ROR regarding its non-compete requirements; it does not require or obligate ROR to provide anything for employees. *Id.* The Court finds that there is no other reasonable meaning of the language of the non-compete provision, thus the language is unambiguous. "The [C]ourt will not create an ambiguity where none exists." *Luttrell*, 60 F. Supp. 2d at 631.

Because the language of the written agreement is unambiguous, the Court may not consider any extrinsic evidence about the agreement. *Id.* Nothing in the non-compete language Hall references guarantees that ROR must employ Hall for at least one year. (Doc. # 52-1). The provision merely indicates that if managers do not work at ROR for an entire year, they may have to pay back some of the benefits ROR provided to them. *Id.* As the Communication Form—the contract between Hall and ROR—does not guarantee Hall one year of employment or pay, nor does it offer employment for an indefinite period of time that can only be terminated with cause,[12] it is not an employment contract as understood under Kentucky law. *See* (Doc. # 52-1); *see also McNutt*, 836 F. Supp. at 421, (including an "annual salary" in an employment agreement does not

---

[11]     *See Obligate*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. To bind by legal or moral duty; to make (someone) have to do something because it is the law or has become that persons' duty. 2. To commit (funds, property, etc.) to meet or secure an obligation.").

[12]     Plaintiff seems to admit as much when she indicates that her term of employment does not have an end date. (Doc. # 64 at 15); *see also* (Doc. # 52 at 54:3–14) (discussing language in Phil Gasper's Communication Form that is identical to the language in hers).

guarantee one year of employment; absent additional evidence, an annual salary is not sufficient to make employment not at-will).

Thus, to the extent that an "employment contract" is in fact a term of art in Kentucky, the Court finds that the Communication Form is not an "employment contract," as some courts in Kentucky have used the term; rather, the Communication Form is merely an agreement about the essential terms of Hall's employment with ROR. Additionally, because there is not a "clear statement [in the Communication Form] not to terminate [Hall] without cause, the assumption is that the parties intended to enter into an ordinary employment relationship, terminable at the will of either party." *Butler v. Progressive Cas. Ins. Co.*, No. 5:04-cv-84 R, 2005 WL 1009621, at *2 (W.D. Ky. Apr. 25, 2005) (quoting *McNutt*, 836 F. Supp. at 421). Accordingly, the Court finds that Hall was employed by ROR at-will.

### b.   ROR Did Not Breach the Contract

Neither of Hall's arguments supporting a breach of contract claim succeed. Hall's apparent argument for breach of contract based on the fact that ROR terminated her six months into her alleged one year of employment, (Doc. # 64 at 15), fails because she is an at-will employee. *See* Part II.C.1.a.ii. *supra*. As an at-will employee Hall could be terminated "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Greissman v. Rawlings & Assocs., PLLC*, 571 S.W.3d 561, 566 (Ky. 2019) (quoting *Asbury Univ. v. Powell*, 486 S.W.3d 246, 262 (Ky. 2016)). Because there is no employment contract guaranteeing that Hall would be employed for a specific period of time, ROR has not committed any breach of contract by terminating her after six months as Area Manager. Thus, a breach-of-contract claim on this ground fails. *See id.*; *Evans*

*v. Two Hawk Emp't Servs.*, No. 2:14-cv-151-WOB-CJS, 2015 WL 403149, at *5 (E.D. Ky. Jan. 28, 2015).

If Hall's argument is that ROR breached the contract by failing to pay her for one year following her termination, (Doc. # 52 at 41:16–21), that fails too.  She claims the agreement for one year of pay is grounded in the non-compete language.  *Id.* at 42:4–7.  As previously discussed, however, the plain language of the agreement is unambiguous; it does not obligate ROR to pay any type of post-termination severance or benefits.  *See* (Doc. # 52-1); Part II.C.1.a.ii. *supra*.  Because the contract does not guarantee one year of pay, ROR did not breach the contract by failing to pay Hall after her termination.  Regardless of which argument Hall hangs her hat on, she has failed to put forth sufficient evidence to establish that ROR breached the agreement between them.  As Hall cannot make out this essential element of the breach-of-contract claim, *see EQT Prod. Co.*, 590 S.W.3d at 293, summary judgment must be **granted** as to ROR on the claim, *Celotex Corp.*, 477 U.S. at 322.

### 2.      *Breach of Company Policy and Procedure*

Hall's second claim alleges that ROR's "conduct and termination of Hall violated company policy and procedure."  (Doc. # 6 at ¶ 37).  Her Amended Complaint, however, does not specifically lay out which action(s) of ROR went against ROR's own policies.  *See generally id.*  Additionally, her response to the summary-judgment Motion does not appear to discuss this claim.  *See generally* (Doc. # 64).

When Hall was asked during her deposition which policy or policies were violated by ROR she responded: "they were preventing me from taking my personal time off," "[t]hey were preventing me from going to a court case," and "[t]hey also gave me my one-

on-one, PIP, and final warning without any other communicating—documented communication forms that was presented to me."[13]  (Doc. # 52 at 167:2–10); *see also id.* at 165:24–166:2 ("They—gave me my final warning, one-on-one, and PIP altogether. They also were—the way and what they acted, I believe was malicious and fraudulent."). When pressed to point to a company policy that was violated by these actions, however, Hall first asked to see a list of policies,[14] *id.* at 167:11–14, and ultimately admitted that "I'm not referencing a written feedback or a written policy," *id.* at 168:2–5.

In essence, Hall failed to identify *any specific policy* which applied to her as an Area Manager, written or otherwise, which was violated by ROR.  More importantly, she has failed to show that a breach of company policy is legally actionable.  *See generally* (Doc. # 64) (failing to put forth any legal argument in support of this claim); *see also  Lewis v. Navistar Int'l Truck 7*, No. 3:15-cv-11, 2016 WL 4376289, at *6 (S.D. Ohio Aug. 17, 2016) (finding that in Ohio "the law does not make a company's breach of or failure to follow its policy actionable").  Thus, summary judgment is **granted** to ROR on Hall's breach-of-company-policy claim because as a matter of law the claim does not appear to be actionable under any set of facts and must be dismissed.[15]  FED. R. CIV. P. 56(a).

---

[13]    She also claimed that her termination violated company policy because it was without cause; she based this argument completely on the Communication Form. *Id.* at 169:10–21. Thus, because it is based off of the Communication Form agreement between Hall and ROR, the Court finds the violation-of-company-policy claim as it relates to her termination, was previously dealt with in the Court's discussion of the breach-of-contract claim.  *See* Part II.C.1 *supra.*

[14]    It is not clear which "list of policies" Hall was referring to as she claimed that she was not subject to the policies in the Employee or Manager Handbooks because she was an executive. (Doc. # 52 at 67:9–21); *see also id.* at 167:15–20 (when asked to turn to the Handbooks to reference the company's policies, Hall suggested that the Handbooks "aren't really reflective on my position.").

[15]    The breach-of-policy claim does not include the words "contract" or "agreement" and therefore is not read as a breach-of-contract claim.  *See Lewis*, 2016 WL 4376289, at *5.  Even if this claim were understood as a contract claim, the Employee Handbook, which appears to

### 3.    *Breach of Representations and Warranties*

Similarly, Hall claims that ROR's "conduct and termination of Hall was a breach of its express and implied representations and warranties to her made by an authorized representative of the company." (Doc. # 6 at ¶ 39).  When asked to distinguish between the express representations, implied representations, and warranties made during her deposition, she seemed to suggest that each claim was effectively based on the same set of alleged promises.  *See generally* (Doc. # 52 at 170–174).  She specifically explained that this claim was generally based on the fact that "[Whitener] made many promises to me—that he didn't fulfill."  *Id.* at 170:18–24.  Specifically, Hall claims that he made promises regarding her future "involvement with the franchise operation," *id.* at 171:8–18, "get[ting] a company car," and "growing within the company," *id.* at 173:12–24.  She also appears to base the claim off of the fact that ROR allegedly did not "follow through with my compensation" after her termination because she was not reimbursed for her last set of gas receipts, which she claims she was promised.  *Id.* at 172:1–13.

### a.    Breach of Warranty

Under Kentucky law, a breach-of-warranty claim is "a theory under which a plaintiff may establish that *a product is defective*."  *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998) (emphasis added); *see also Allen v. Abbott Labs.*, No. 2:11-cv-146-DLB, 2012 WL 10508, at *5 (E.D. Ky. Jan. 3, 2012) (explaining that a buyer-seller

---

contain company policies, specifically states that it is not a contract, *see* (Doc. # 52-5 at 5); *see also Cummins v. City of Augusta*, No. 2012-CA-001641-MR, 2013 WL 5436657, at *2 (Ky. Ct. App. Sept. 27, 2013) (a handbook may confer contractual rights and be a binding contract with employees, but not if "it contains a specific provision refuting the creating of an employment contract"), and Hall argues that she is not subject to the policies within the Handbook, (Doc. # 52 at 67:9–21).  Thus, Hall did not contractually agree to any policies beyond those included in the Communication Form (namely the confidentiality and non-compete policies), which have previously been discussed.  *See* Part II.C.1 *supra*.

relationship is necessary for a breach-of-warranty claim, but there are "narrow statutory exceptions provided for the family members and household guests of that buyer."); *Bridgefield Cas Ins. Co. v. Yamaha Motor Mfg. Corp. of Am.*, 385 S.W.3d 430, 434 (Ky. Ct. App. 2012) (a breach-of-warranty claim requires a plaintiff to show a buyer-seller relationship).   Hall fails to set forth any legal argument as to how ROR's alleged actions satisfy the elements of a breach-of-warranty claim.  *See generally* (Doc. # 64).  In fact, as a matter of law, Hall's allegations about the promises that ROR allegedly made to her are not actionable through a breach-of-warranty claim in Kentucky.  *McCoy*, 47 F. Supp. 2d at 839.  Accordingly, summary judgment is **granted** to ROR on the breach-of-warranty aspect of this claim as Hall has not alleged any facts which would allow a jury to find for her on a breach-of-warranty claim; the claim must be dismissed as a matter of law.  FED. R. CIV. P. 56(a).

### b.     Breach of Express or Implied Representations

Hall has also failed to set forth any legal support for her breach-of-representation claim; in fact, a claim for breach of representation does not appear to be actionable in Kentucky.  Rather, it appears that breach-of-representation claims are one in the same as breach-of-warranty claims.  *See Johnson v. S. R. Penn, Jr., Marital Trust*, No. 6:08-cv-359-GFVT, 2009 WL 10676552, at *2–4 (E.D. Ky. June 2, 2009) (appearing to group together allegations of breaches of warranties and representations).  Accordingly, for the same reasons that summary judgment was granted as to the breach-of-warranty claim, *see* Part II.C.3.a *supra*, summary judgment is **granted** as to this claim as well.[16]

---

[16]     The arguments set forth in Hall's brief responding to the summary-judgment Motion suggest, perhaps, that through her breach-of-representation claim she is attempting to assert a fraudulent misrepresentation and/or fraudulent omission claim against ROR.  *See* (Doc. # 64 at 17–18).  A new claim cannot be raised, however, in a response to a summary-judgment motion.

### 4.    Breach of Fiduciary Duty

Hall also asserts that ROR's "conduct and termination of Hall was a breach of its fiduciary duty to her as an executive in the company."  (Doc. # 6 at ¶ 38).  This claim is

---

*Tucker v. Union of Needletrades, Industrial and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2723 (3d ed. Supp. 2005)).

Even if the Court were to find that the fraudulent-misrepresentation claim or fraudulent-omission claim had been raised in the Amended Complaint, summary judgment would be granted and the claims would be dismissed.  A claim for fraudulent misrepresentation requires a plaintiff to prove the following:

> (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard to its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff.

*Giddings & Lewis, Inc. v. Indus. Risk Insurers.*, 348 S.W.3d 729, 747 (Ky. 2011) (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009); *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999)).  As explained in more detail below, *see* Part II.C.6 *infra*, a claim for fraudulent misrepresentation cannot be based on "statements which are promissory in their nature when made and which relate to future actions or conduct."  *McDorman v. D&G Props.*, No. 5:18-cv-36-TBR, 2019 WL 3367001, at *3 (quoting *Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964)).  Rather, these types of statements may form the basis of a fraudulent-inducement claim.  *Id.* (citing *Davis v. Siemens Med. Sols., USA, Inc.*, 399 F. Supp. 2d 333, 353 (W.D. Ky. 2012)).

The statements Hall appears to be basing her misrepresentation claim on are statements about future conduct including being reimbursed for travel expenses as well as eventually receiving a company car and an ownership interest in ROR.  (Doc. # 52 at 171:8–18, 172:1–13, 173:12–24).  As these are promises ROR allegedly claimed it would undertake in the future, they cannot form the basis of a fraudulent-misrepresentation claim and such a claim would fail.  *See McDorman*, 2019 WL 3367001, at *3 (quoting *Mario's Pizzeria, Inc.*, 379 S.W.2d at 740).  Rather, the Court will address some of these alleged representations claims in the context of fraudulent-inducement claims later in this Opinion.  *See* Part II.C.6 *infra*.

In contrast, a fraud-by-omission claim requires a plaintiff to prove the following: "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence."  *Giddings & Lewis, Inc.*, 348 S.W.3d at 747. (citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003)).  While Plaintiff alludes to the allegation that ROR committed fraudulent omissions by failing to disclose its concerns about Hall's performance as a part-time Trainer, (Doc. # 64 at 17–18), Hall fails to put forth any legal or factual authority indicating that ROR owed her a duty to disclose that information.  As she has failed to put forth any authority supporting this essential element of a fraud-by-omission claim, the claim would fail.  *Celotex Corp.*, 477 U.S. at 323.

based on Hall's belief that representatives of ROR were not honest and truthful with her regarding a number of issues.  (Doc. # 52 at 170:1–17).  She argues more specifically in her response to the summary-judgment Motion that Whitener and Maymo, Vice President of ROR, breached a duty of honesty and fair dealing that they owed to Hall as a co-executive of ROR, but does not specify which statements or representations breached this duty.[17]  (Doc. # 64 at 22).  She does seem to suggest, however, that the promises and representations she is referring to were made prior to her accepting the Area Manager position at ROR (and prior to her allegedly becoming an executive of the company).  *See id.* at 8, 22 (explaining that she was an executive as Area Manager and seeming to note that the representations that breached this fiduciary duty occurred before she left ECJ to take the Area Manager position).

Yet again, however, Hall fails to put forth *any legal authority* in support of her claim *or* point to *any specific evidence* in the record indicating that there is a genuine dispute of material fact as to whether Whitener and Maymo owed her a fiduciary duty, which they breached.  *Id.*  The Court is tempted to grant summary judgment on the claim for this reason alone; the burden falls on the plaintiff, not the court to "produc[e] concrete evidence to demonstrate a genuine issue of material fact."  *Anderson v. Chesley*, Nos. 2:10-cv-116-DCR, 2:10-cv-117-DCR, 2011 WL 3319890, at *2 (E.D. Ky. Aug. 1, 2011)

---

[17]    Hall also seems to suggest that some additional fiduciary duty was owed to Hall because ROR's "representation that she would be an owner upon franchising created a special obligation to her by the defendant since it was separately triggered by their planned enterprise."  (Doc. # 64 at 22).  Hall does not further explain this statement and puts forth no legal authority in an attempt to explain this assertion.  The Court will not waste precious judicial resources attempting to discern the argument that Plaintiff is trying to make, especially when Plaintiff has put forth no effort at coherent argumentation despite multiple extensions of time to file her brief.  *See* (Docs. # 58, # 62 and # 70).

(citing *Chao*, 285 F.3d at 424); *see also Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'[J]udges are not like pigs, hunting for truffles' that might be buried in the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

In order to succeed on a claim for a breach of fiduciary duty in Kentucky,[18] the plaintiff must prove the following: "1) existence of a fiduciary duty, 2) a breach of that duty, 3) and that the breach caused injury to the party to whom the duty was owed." *Seeger Enters., Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017) (citing *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky. 2013)); *see also Arnold v. Liberty Mutual Ins. Co.*, 392 F. Supp. 3d 747, 775 (E.D. Ky. 2019). "There is no lockstep recipe for ascertaining when a fiduciary relationship exists." *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 770 (6th Cir. 2009) (citing *Abney v. Amgen, Inc.*, 443 F.3d 540, 550 (6th Cir. 2006)). Generally, "a fiduciary relationship turns 'on trust or confidence reposed by one person in the integrity and fidelity of another' that 'necessarily involves an undertaking in which a duty is created in one person to *act primarily for another's benefit* in matters connected with such an undertaking.'" *Id.* at 770–71 (emphasis added) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)).

---

[18]     Ohio law governs the fiduciary duties owed by a member of an Ohio limited liability company to the company and other members, OHIO REV. CODE § 1705.281, as well as the fiduciary duties owed by officers to the limited liability company and its members, OHIO REV. CODE § 1705.292. There is no evidence that Hall had any ownership interest in ROR at the time of the alleged breach of fiduciary duty, so she was not a member of ROR, *see* OHIO REV. CODE § 1705.14; therefore she was not owed fiduciary duties under Ohio law as a member of the limited liability company, OHIO REV. CODE §§ 1705.281, 1705.292.

A fiduciary relationship does not exist between parties in "ordinary business relationship[s]." *Id.* at 771 (quoting *Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n, Inc.*, 242 S.W.3d 359, 364–65 (Ky. Ct. App. 2007)).  Additionally, "[c]orporate officers generally do not owe fiduciary duties to at-will employees."  *Id.* (citations omitted) (despite an oral agreement that "they were 'essentially partners, or co-owners'" and "they would work in each other's best interests," the court found the plaintiff was still an at-will employee and not owed a fiduciary duty); *see also Miller v. Reminger Co., L.P.A.*, No. 3:11-cv-315-CRS, 2012 WL 529822, at *2–3 (W.D. Ky. Feb. 17, 2012) (dismissing plaintiff's argument to "look beyond the parties' employment agreement and find that [they] were business partners" and instead finding no fiduciary duty because plaintiff was an at-will employee).

The Court has previously found that Hall was an at-will employee of ROR, *see* Part II.C.1.a.ii *supra*, and therefore was not owed fiduciary duties by ROR officers.  *See Gresh*, 311 F. App'x at 771.  Additionally, Hall has not pointed to any specific evidence in the record that creates a genuine issue of material fact as to whether representatives of ROR in fact owed her any fiduciary duty or that Whitener and Maymo undertook a duty to act primarily for Hall's benefit.  (Doc. # 64 at 22) (citing page 175 of Hall's deposition, which does not include any discussion of a specific breach-of-fiduciary-duty claim other than to say she thinks the breach-of-fiduciary-duty claim, breach-of-representations-and-warranties claim, and detrimental-reliance claim do not "all cover the same ground").  Additionally, it appears that the representations Hall could possibly have relied upon in support of this claim were made *prior* to Hall accepting the Area Manager position, which she alleges made her a co-executive owed a fiduciary duty in the first place.  *See id.* at 8, 22.

Moreover, from Hall's arguments, *see id.* ("The defendant concedes in its argument that fiduciary obligations apply whether the relationship is created based upon the integrity and fidelity which is exactly what Ms. Hall testified to at length—promises and representations were made but not kept and material information was purposefully withheld[.]  Mr. Whitener was simply dishonest and untruthful in violation of this duty.") (citing Doc. # 52 at 175)), her breach-of-fiduciary duty claim, like many others, appears to be a thinly-veiled attempt to turn the same alleged misrepresentations which form the basis of her fraudulent-inducement claim, into another claim she could bring before the Court.

As Hall was an at-will employee, however, Whitener and Maymo owed her no fiduciary duty, regardless of whether there were any conversations between her and Whitener suggesting she would be an executive of ROR.  *Gresh*, 311 F. App'x at 771; *Miller*, 2012 WL 529822, at *2–3.  Additionally, even if a fiduciary duty was eventually owed to Hall as an executive at ROR, it does not appear such a duty was owed to Hall at the time the representations were made.  *See* (Doc. # 64 at 8, 22) (indicating that Hall was allegedly an executive when she became Area Manager but seeming to suggest the representations which breached the alleged fiduciary duty were made prior to Hall becoming Area Manager).  Thus, as at least one element of the breach-of-fiduciary-duty claim is not satisfied as a matter of law, *see Seeger Enters., Inc.*, 518 S.W.3d at 795 (citing *Baptist Physicians Lexington, Inc.*, 436 S.W.3d 189), summary judgment must be **granted** on this claim on behalf of ROR.  *Celotex Corp.*, 477 U.S. at 322–23.

### 5.    *Detrimental Reliance*

Hall also appears to bring a claim for detrimental reliance by asserting that ROR

"falsely provided written and verbal assurances to Hall that she relied upon to her detriment."  (Doc. # 6 at ¶ 40).   Hall elaborated in her deposition that the written assurances were those in the Communication Form and the verbal assurances were those she discussed throughout her deposition.   (Doc. # 52 at 175:1–18).   More specifically, she claims that it was the "defendant's unexpressed concerns," presumably about her performance prior to becoming Area Manager, and "its affirmative representations," presumably about the benefits she would receive as Area Manager (including alleged oral representations that she was not an at-will employee), that "were clearly material to Ms. Hall's decision to accept the Area Manager position" and that Hall "reasonably relied upon . . . to her detriment."  (Doc. # 64 at 17–18).  It should be noted that, once again, Hall fails to point to any specific portion of the record to support her arguments.  *See, e.g.*, *id.* at 17 (saying that "Ms. Hall specifically set out the oral discussions between her and Mr. Whitener that confirmed she was not an 'at-will' employee but instead part of a long-term relationship with the company" but providing no citation to the record).   The Court feels as though summary judgment again could be granted on this basis alone as Plaintiff has not met her burden under Federal Rule of Civil Procedure 56(c); the Court will, however, attempt to address the claim out of an abundance of caution.

There is no claim for detrimental reliance under Kentucky law.  *Class Racing Stable, LLC v. Breeders' Cup Ltd.*, No. 5:16-cv-200-KKC, 2017 WL 562175, at *1 (E.D. Ky. Feb. 10, 2017); *Game Science, Inc. v. Gamestation, Inc.*, No. 4:14-cv-44-JHM, 2014 WL 12726643, at *8 (W.D. Ky. Oct. 21, 2014) ("[D]etrimental reliance is an element of another cause of action [(promissory estoppel)], and not an independent cause of

action.").   Rather, Courts applying Kentucky law often construe a claim for detrimental reliance as one for promissory estoppel.  *Webb v. Ky. State Univ.*, 468 F. App'x 515, 526 (6th Cir. 2012); *Class Racing Stable, LLC*, 2017 WL 562175, at *1; *Equiventure, LLC v. Wheat*, No. 5:09-cv-93, 2012 WL 2089532, at *7–8 (W.D. Ky. June 8, 2012); *John F. Ruggles, Jr., Inc. v. Ventex Tech., Inc.*, No. 5:09-cv-141-KSF, 2011 WL 2971839, at *6–7 (E.D. Ky. July 21, 2011); *see also Zeiger v. Carl Zeiss Vision, Inc.*, No. 2:18-cv-198-DLB-CJS, 2020 WL 1317477, at *4 (E.D. Ky. Mar. 20, 2020) (suggesting that there is no "distinction [between promissory estoppel and detrimental reliance] under Kentucky law" (alteration in original)).

In fact, it appears from Hall's response brief that she may be attempting to bring a claim for promissory estoppel rather than a claim for detrimental reliance.[19]  (Doc. # 64 at 17–18) (citing cases discussing promissory estoppel including *Rickert*, 996 S.W.2d at 468–69, *McCarthy v. Louisville Cartage Co., Inc.*, 796 S.W.2d 10, 12 (Ky. Ct. App. 1980)).  "Generally, a claim for promissory estoppel can arise where 'a party reasonably relies on a statement of another and materially changes his position in reliance on that statement.'"  *Arnold*, 392 F. Supp. 3d at 778 (quoting *Rivermont Inn, Inc.*, 113 S.W.3d at 642).  Four elements must be met in order to succeed on a claim for promissory estoppel in Kentucky:  "(1) a promise; (2) which the promisor should reasonably expect to induce action or

---

[19]      Defendant ROR argues that a promissory-estoppel claim should not be considered by the Court because it was first raised in Hall's response brief.  (Doc. # 71 at 8 n.3).  The Court agrees that it is inappropriate for new claims to be raised at this stage.  *Tucker*, 407 F.3d at 788 (citing *Gilmour*, 382 F.3d at 1315; 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2723 (3d ed. Supp. 2005)).  Given, however, that Kentucky courts often interpret detrimental-reliance claims as promissory-estoppel claims, the Court will address the merits of a potential promissory-estoppel claim out of an abundance of caution.  Additionally, as the promissory-estoppel claim ultimately fails, *see infra*, the concern raised by ROR is moot.

forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can only be avoided by enforcement of the promise." *Id.* (quoting *Schlenk v. Goodwill Indus. of Ky., Inc.*, No. 3:16-cv-00601-JHM, 2016 WL 6836945, at *3 (W.D. Ky. Nov. 18, 2016)).

The promises Hall *appears* to base her claim on are twofold: (1) the alleged promises that she was not an at-will employee and was guaranteed at least one year of employment and/or one year of pay after termination, and (2) the alleged promises of additional compensation and benefits including a company car, a future ownership interest in an ROR franchise, and $5000 to compensate her for prior work. *See* (Docs. # 64 at 17–18 and # 64-1 at 2–3). It is not completely clear, however, as Hall failed to specify in her response, which alleged promises she relied upon to support the promissory-estoppel claim. *See* (Doc. # 64 at 17–18). It is clear, however, that all the alleged promises were made *prior* to Hall accepting the position of Area Manager and signing the Communication Form.

"The doctrine of promissory estoppel is 'fundamentally different from a contract'" and "is not an alternative to a standard breach of contract claim, but rather it is founded upon a completely independent theory of recovery." *Arnold*, 392 F. Supp. 3d at 778 (quoting *Jan Rubin Assocs., Inc. v. Housing Auth. of Newport*, No. 2:03-cv-160, 2007 WL 1035016, at *13 (E.D. Ky. Mar. 30, 2007)); *see also Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) ("[I]t is a 'widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract.'" (quoting *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th Cir. 1999)). The doctrine of promissory estoppel is not to be used as a second chance when a breach of contract

claim fails.  *Shane*, 200 F. App'x at 404 ("Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." (quoting *General Aviation Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990)).

It is well settled in Kentucky that "an oral promise made *prior* to the execution of a written agreement that is inconsistent with the unambiguous terms of the written agreement cannot form the basis of a promissory estoppel claim." *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 789, 797–99 (W.D. Ky. 2005) (finding that a promise of additional compensation made prior to signing a written agreement which included a "compensation plan" cannot be the basis of a promissory-estoppel claim); *see also Arnold*, 392 F. Supp. 3d at 779 (plaintiff's promissory-estoppel claim based on an alleged promise about the scope of insurance policy coverage fails because it was made prior to signing the insurance agreement which expressly excludes the coverage the alleged promise covered); *Miller*, 2012 WL 2050239, at *11 (finding that that the alleged promise that plaintiff would receive higher bonuses if his business generation continued, and which plaintiff alleges "induced him to accept a lower salary," cannot be the basis for a promissory-estoppel claim as the alleged promise was made prior to the plaintiff signing the employment agreement).

"Therefore, where there is a written contract, the enforceability of which is not in question, this Court has consistently dismissed promissory estoppel claims that are based on the same performance as is contemplated by the written agreement."  *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 729 (W.D. Ky. 2013); *see also Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198, 1205–06 (W.D.

Ky. 1995) (dismissing a promissory-estoppel claim based on alleged oral representations made by defendant prior to signing a written agreement because the performance allegedly induced by the oral representation was the same performance that "was a requirement of their signed . . . agreement . . . [and] that, in part, constituted consideration for the franchise agreement").  The fact that the alleged oral promises or representations were not ultimately included in the Communication Form does not change the fact that the promissory-estoppel claim must be dismissed.  *Derby City Capital*, 949 F. Supp. 2d at 730–31 (finding that the fact that a defendant "made promises or assurances to Plaintiffs that were not part of [the] contracts is immaterial, because the performance promised or assured is the same performance bargained for in the written contracts."); *Gonzalez v. Imaging Advantage, LLC*, Civ. No. 11-243-C, 2011 WL 6092469, at *2 (W.D. Ky. Dec. 7, 2011).

The promises here regarding Hall's job/compensation security and additional compensation she would ultimately receive (a car, $5000, an ownership interest in ROR) were all made prior to her signing her Communication Form to become Area Manager. (Doc. # 64-1 at 2–3).  She claims that these promises induced her to accept the full-time position with ROR and agree to work as an Area Manager.  *Id.*  None of these alleged oral promises, however, are included in the Communication Forms Hall signed.  *See* (Doc. # 52-1); *see* Part II.C.1. *supra*.  Because the promises induced her to undertake the same performance—serving as Area Manager—as she agreed to undertake by signing the Communication Form, summary judgment must be **granted** to ROR and Hall's promissory-estoppel claim must be dismissed.  *See Derby City Capital, LLC*, 949 F. Supp. 2d at 729–31; *Davis*, 399 F. Supp. 2d at 797–99.

### 6.    *Fraudulent Inducement*

Plaintiff also alleges that ROR acted fraudulently during its interactions with Hall. The Amended Complaint specifically alleges that ROR fraudulently induced "Hall to resign a secure and stable position to accept a position which [ROR] knew or should have known was neither."  (Doc. # 6 at ¶ 41).  Her fraudulent-inducement claim appears to be based on the same four promises previously discussed and allegedly made to her by ROR: she would be paid $5000.00 for design work she performed during her previous employment with ROR, her job would be secure, a company car would be provided to her, and she "would be provided an ownership interest in the company." [20]  *Id.* at ¶ 16.  Hall claims that she relied on these promises in deciding to resign from her employment with ECJ and accept the Area Manager position at ROR.[21]  ROR moves for summary judgment on the

---

[20]    Hall seems to admit that the alleged promise that Hall would be named the Executor of Whitener's will is not a basis of this claim.  *See* (Doc. # 64 at 21) ("Ms. Hall agrees that being named Mr. Whitener's Executor in his Will is not compensable but is instead offered as evidence as to the depth and specificity of the discussions that the defendant engaged in to recruit her away from Elizabeth Cole.").  Thus, the Court will not discuss it when determining if a fraudulent-inducement claim can proceed.

Additionally, ROR seems to understand that the alleged promise that Hall could work from her home also underpins Hall's fraudulent-inducement claim.  (Doc. # 53 at 26).  From the allegations in Hall's Amended Complaint, *see generally* (Doc. # 6), and Hall's arguments in her brief, (Doc. # 64 at 20–22), however, Hall does not appear to argue that this promise to work from home is one of the alleged promises upon which her fraudulent-inducement claim is based.  In the interest of judicial efficiency, the Court will address only the alleged promises that Hall argues induced her to leave ECJ.

[21]    Throughout her brief, Hall continually mentions that ROR made fraudulent misrepresentations to Hall and fraudulently omitted information that impacted her decision to accept the Area Manager position with ROR.  Hall's Amended Complaint, however, does not discuss fraudulent omissions or misrepresentations beyond those that are part of the fraudulent-inducement claim.  Hall cannot bring new claims at this stage.  *See* Part II.C.11 *infra*; *see also Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020).  Rather, such a fraud claim would have to have been specifically pled in a plaintiff's complaint.  Fᴇᴅ. R. Cɪᴠ. P. 9(b).  Additionally, as the Court has previously discussed, such claims would not survive summary judgment.  *See* Part II.C.3.b *supra*.  Accordingly, the Court will not consider any arguments or allegations of fraudulent omissions or allegations of fraudulent misrepresentations beyond those embedded in the clearly-pled fraudulent-inducement claim.

fraudulent inducement claim arguing that there is no evidence that ROR "knowingly made a false promise to Hall to induce Hall to leave ECJ." (Doc. # 53 at 15–26). ROR also appears to argue that the claim fails because the alleged promises made are not enforceable.[22] *Id.*

A plaintiff must show six elements by clear and convincing evidence[23] in order to succeed on a fraudulent-inducement claim: (1) defendant made a material representation, (2) the representation is false, (3) defendant knew that the representation was false or defendant made the representation recklessly, (4) defendant made the representation with the intention for it to be acted on, (5) plaintiff acted upon the representation "in reliance thereon," and (6) this caused injury to the plaintiff. *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 188 (Ky. Ct. App. 2014); *see also Preferred Care of Del., Inc. v. Crocker*, 173 F. Supp. 3d 505, 523 (W.D. Ky. 2016). Generally, "a misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010) (quoting *Filibeck v. Coomer*, 182 S.W.2d 641, 643 (1944)); *see also McDorman*, 2019 WL 3367001, at *3 (quoting *Mario's Pizzeria, Inc.*, 379 S.W.2d at 740). Despite this general rule, fraud in the inducement can lie from a defendant

---

[22]     ROR seems to argue that dismissal is also proper because the fraudulent-inducement claim was not specifically pled as required by Federal Rule of Civil Procedure 9(b). (Docs. # 53 at 16–17 and # 71 at 6–7). The Sixth Circuit has made clear, however, that failure to follow pleading requirements is not grounds for dismissal of a claim at the summary-judgment stage. *McCarthy v. Ameritech Pub. Inc.*, 763 F.3d 469, 478 n.2 (6th Cir. 2014).

[23]     At the summary-judgment stage "the plaintiff does not have to show clear and convincing evidence . . . only evidence that could support a reasonable factfinder in their determination of fraud by the clear and convincing evidence standard." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, No. 5:11-cv-374-DCR, 2014 WL 1577040, at *6 (E.D. Ky. Apr. 17, 2014).

"making representations as to his future intentions *when in fact he knew at the time the representations were made he had no intention of carrying them out*." *Bear, Inc.*, 303 S.W.3d at 142 (emphasis added) (quoting *Major v. Christian Cty. Livestock Market*, 300 S.W.2d 246, 249 (Ky. 1957)); *see also Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky. 1952); *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 615 (Ky. Ct. App. 2011).  In other words, fraudulent-inducement claims require proof of the same elements as fraudulent misrepresentation, and effectively fall under the umbrella of fraudulent misrepresentation; the difference is that a misrepresentation claim deals with the misrepresentation of "a present or pre-existing fact" whereas an inducement claim applies to "a misrepresentation of a future fact." [24]   *See LV Ventures, LLC v. Schott*, Nos. 2011-CA-000473-MR, 2011-CA-000640-MR, 2011-CA-001132-MR, 2012 WL 5039235, at *2 (Ky. Ct. App. Oct. 19, 2012); *see also In re Sallee*, 286 F.3d at 905.  Such a fraud claim may be proved wholly by circumstantial evidence.[25]  *See Danial*, 354 S.W.3d at 616.

Importantly, "the plaintiff's reliance on the material representation *must be reasonable*" in order for a claim to be actionable.  *Crocker*, 173 F. Supp. 3d at 523

---

[24]   "The proper distinction between fraudulent misrepresentation and inducement derives from the context in which the fraudulent misrepresentation occurred."  *In re Sallee*, 286 F.3d 878, 905 (6th Cir. 2002) (Batchelder, J., concurring).  Specifically, "[i]f this misrepresentation occurred with the 'intention of inducing' a party to act, the result is fraudulent inducement.  If the misrepresentation did not occur within the context of inducing another to act, but instead was a misrepresentation for other purposes, the result is another form of fraud."  *Id.*

[25]   "The courts of this Commonwealth have long recognized that parties contemplating the commission of fraud do not usually blow a horn or beat a drum to call attention to what they are doing, and have accordingly held that frauds may be established by circumstances."  *Danial*, 354 S.W.3d at 616 (internal quotations and citations omitted) (quoting *Johnson v. Cormney*, 596 S.W.2d 23, 27 (Ky. Ct. App. 1979), *overruled on other grounds by Marshall v. City of Paducah*, 618 S.W.2d 433 (Ky. Ct. App. 1981)).  Moreover, "even though each bit of circumstantial evidence in and of itself may seem trivial and unconvincing, the combination of all the circumstances considered together may be decisive in a given case of fraudulent design."  *Id.* (internal citations omitted) (quoting *Johnson*, 596 S.W.2d at 27).

(emphasis added) (citing *Flegles, Inc.*, 289 S.W.3d at 549); *see also Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 210 (6th Cir. 2019).  "[W]hether reliance is justified (or as sometimes stated, reasonable) is a question of fact in all but the rarest of instances." *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 47 (Ky. 2018) (collecting cases).  The reasonability of a plaintiff's reliance on a representation may be impacted by the relationship between the plaintiff and the person making the representation.  *See PBI Bank, Inc. v. Signature Point Condominiums, LLC*, 535 S.W.3d 700, 715 (Ky. Ct. App. 2016); *Danial*, 354 S.W.3d at 616–17 (citing *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764, 767 (Ky. Ct. App. 1985)); *see also Yung*, 563 S.W.3d at 46 (discussing the factors from § 542 Restatement (Second) of Torts which impact whether reliance on an opinion is reasonable).  Courts have found that evidence indicating a friendship between the parties may be sufficient to raise an issue of fact as to whether the promisee's reliance on the alleged promise was reasonable.  *Danial*, 354 S.W.3d at 616–17.

### a.    Alleged Promise of Job Security

Hall argues that Whitener allegedly promised her job security at ROR, which induced her to leave her position at ECJ.  *See* (Doc. # 64 at 16).  "[A]s a matter of law [in Kentucky], a party may not rely on oral representations that conflict with written disclaimers to the contrary which the complaining party earlier specifically acknowledged in writing."  *Bisig*, 940 F.3d at 211 (quoting *Rivermont Inn*, 113 S.W.3d at 640–41).  This rule applies to fraudulent misrepresentation and inducement claims.  *Id.* at 211–213; *Turner v. Leggett & Platt, Inc.*, No. 5:08-cv-00113-TBR, 2010 WL 1049849, at *6–7 (W.D. Ky. Mar. 19, 2010).  Specifically, courts applying Kentucky law have found that plaintiffs cannot succeed on either claim based on alleged promises of job security if, following the

promise, the plaintiff signed a document indicating that their employment is at-will. *Bisig*, 940 F.3d at 211–13; *Turner*, 2010 WL 1049849, at *7. In those cases, the court found the plaintiff's reliance on the promise of job security to be unreasonable.[26] *Bisig*, 940 F.3d at 212–13.

Here, Hall's reliance on the alleged promise of job security was unreasonable because, after the alleged promise was made, she signed an employment agreement for at-will employment. *See* Part II.C.1.a.ii *supra*; *see also Bisig*, 940 F.3d at 211–13. *Rickert*, cited by Plaintiff in support of her claim (Doc. # 64 at 17), "illustrate[s] the uncontroversial principle that a plaintiff may *sometimes* establish reasonable reliance based on defendant's oral representations," but that, however, is not always the case. *Bisig*, 940 F.3d at 212 (citing *Rickert*, 996 S.W.2d 464; *Brown v. Louisville Jefferson Cty. Redevelopment Auth., Inc.*, 310 S.W.3d 221 (Ky. Ct. App. 2010); *Olivard v. J.J.B. Hilliard, W.L. Lyons, Inc.*, No. 2010-CA-001138-MR, 2013 WL 762593 (Ky. Ct. App. Mar. 1, 2013)). Accordingly, Hall's fraudulent-inducement claim based on this promise must fail; she did not *reasonably* rely on the alleged promise made by Whitener and cannot meet her burden of proving all elements of fraudulent-inducement claim by clear and convincing evidence.

### b.    Other Alleged Promises

Hall also claims that Whitener's alleged promises that she would be paid an additional $5000.00 for her previous design work and would eventually get a company

---

[26]    Plaintiff appears to cite *Hammond v. Heritage Comms. Inc.*, 756 S.W.2d 152, 154 (Ky. Ct. App. 1988) in support of her claim. (Doc. # 64 at 18). *Hammond* is distinguishable, however. In that case the alleged promise of job security appears to have been made after the at-will employment agreement was reached; in other words, the oral promise was modifying her at-will status. *Hammond*, 756 S.W.2d at 154. Here, the alleged promise of job security was made prior to Hall signing the Communication Form.

car and an ownership interest in ROR induced her to leave her position at ECJ.  (Doc. # 64-1 at 3).  ROR appears to argue that these alleged promises, even if made, are not legally enforceable and therefore cannot be the basis of a fraudulent-inducement claim. (Doc. # 53 at 17–18, 24–26).   ROR, however, puts forth no legal authority for this proposition. *Id.*

The crux of a fraudulent-misrepresentation claim is the intent of the defendant, not the legality of the promise made.  *Reesor v. City of Audubon*, No. 2016-CA-000127-MR, 2017 WL 2609243, at *6 (Ky. Ct. App. June 16, 2017) (explaining that "[i]f the [defendant] intended to keep its promises of retirement benefits at the time it made them—*regardless of whether the promises were legal or illegal*—no fraud could have occurred").  In other words, whether a promise would ultimately be enforceable does not appear to have any bearing on whether a fraudulent-inducement claim succeeds.  *See id.*; *Danial*, 354 S.W.3d at 614 (citing *Hanson*, 865 S.W.2d at 307 (citing RESTATEMENT (SECOND) OF TORTS § 530 com. (c) (1976))).  Rather, it appears the Court must focus on the defendant's intent when making the promise and the reasonability of the plaintiff's reliance on that promise.

As to these three alleged promises, Hall has shown there is a genuine issue of material fact as to whether her reliance on Whitener's alleged promises was reasonable. Thus, the fraudulent-inducement claim based on these promises may proceed to a jury and summary judgment is precluded.  Hall has testified that Whitener made each of the three alleged promises to her prior to her accepting the position as Area Manager, which she relied upon when determining whether to accept the position.  (Docs. # 52 at 35:1– 11, 37:13–19 and # 64-1 at 3).   Whitener, however, disputes ever making any such

promises.  (Doc. # 65 at 208:4–209:3, 230–32).  Viewing all of the evidence presented in the light most favorable to Hall, the Court finds that a jury could conclude that there is clear and convincing evidence supporting a fraudulent-inducement claim.  For example, a jury could find Hall to be more credible than Whitener and conclude that Whitener did in fact make the promises to her.  Additionally, given Hall and Whitener's long friendship, (Doc. # 65 at 78:19–22, 81:8–12, 85:10–13, 86:6–20), a jury could find that Hall's reliance on Whitener's alleged representations was reasonable.  Thus, there is a genuine issue of material fact as to whether the allegedly false representations were made at all and whether Hall's reliance on the alleged promises was reasonable.  Accordingly, summary judgment on the fraudulent-inducement claim must be **granted in part** (as to the job security promise) and **denied in part** (as to the remaining promises).

### 7.    *Tortious Interference*

Hall also brings a claim of tortious interference in a contractual relationship, alleging "Rag-O-Rama tortiously and intentionally interfered with Hall's contractual relations with her prior employer to her detriment."  (Doc. # 6 at ¶ 40).  Hall claims that ROR caused the "termination" of the relationship between Hall and her prior employer ECJ.  (Doc. # 64 at 18–19).  In its Motion for Summary Judgment, ROR argues that the claim fails because Hall "voluntarily resigned her employment at ECJ."  (Doc. # 53 at 27).  ROR also argues that there is no evidence that (1) ROR had any contact with ECJ, or (2) that Hall had a contractual relationship with ECJ.  *Id.*

Six elements must be shown in order to succeed on a claim of tortious interference with a contract under Kentucky law: "(1) the existence of a contract, (2) [ROR's] knowledge of this contract, (3) that [ROR] intended to cause its breach; (4) that [ROR's]

42

conduct caused the breach; (5) this breach resulted in damages to [Hall]; and (6) [ROR] had no privilege or justification to excuse [its] conduct." *Outfront Media, LLC v. LeMaster*, 399 F. Supp. 3d 671, 691 (E.D. Ky. 2019). This tort "is one for *intentional* interference with a contract." *Id.* "Liability attaches to '[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Id.* (alterations in original) (quoting *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 533–34 (Ky. Ct. App. 2005)).

Hall's claim under this theory fails because there is no evidence of a contract between Hall and ROR. In fact, when asked specifically during her deposition "you had a contract with Elizabeth Cole; is that right?" Hall responded: "I did not have a contract, but I had a longstanding work relationship with them." (Doc. # 52 at 182:3–6); *see also* (Doc. # 64-1 at 4) ("I did not have an employment contract with Elizabeth Cole Jewelry."). While in her response to the Motion she seemingly attempts to create an issue of fact as to the presence of a contract by trying to suggest that there was some type of oral or implied contract between the parties, (Doc. # 64 at 19) ("While the contractual relationship between Ms. Hall and Elizabeth Cole was not reduced to writing, it consisted of the specific title of Director of Operations along with a defined pay structure and was in effect for eight years."), Hall has failed to point to *any evidence*, *see* FED. R. CIV. P. 56(c), which indicates that there is a *genuine* issue of material fact as to whether a contract existed between Hall and ECJ. Rather, it appears that Hall is merely showing "that there is some metaphysical doubt as to the facts," which is not sufficient to defeat summary judgment. *Matsushita*, 475 U.S. at 586.

Moreover, even if Hall had pointed to new evidence in her response brief, post-deposition evidence which contradicts deposition testimony is often stricken unless there is "a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). Here, however, Hall has not submitted any post-deposition evidence suggesting there was a contract between her and ECJ, but merely makes a vague allegation in her response brief without any explanation as to why her brief contradicts her clear deposition testimony and discovery response. Thus, the Court finds that there is not a genuine issue of material fact as to whether a contract existed between ECJ and Hall. As there is no evidence supporting an essential element of the claim, *see Outfront Media, LLC*, 399 F. Supp. 3d at 691, summary judgment must be **granted** for ROR as to the claim for tortious interference. *See Celotex Corp.*, 477 U.S. at 322–23.

### 8.   *Negligent or Intentional Infliction of Emotional Distress*

Additionally, Hall alleges that ROR's "conduct and termination of Hall was negligently or intentionally designed to inflict emotional distress, for which it is liable in tort." (Doc. # 6 at ¶ 46). She claims that ROR's termination of her without cause led to emotional distress because it left her without an income while she was caring for her granddaughter. (Doc. # 52 at 189:14–19). Hall also alleges that the termination impacted her relationships—including with her family and boyfriend—and her health because she could not sleep or eat. *Id.* at 189:19–190:1. She admitted, however, that she did not seek any treatment and was not prescribed any medication for the emotional distress she allegedly suffered.[27] *Id.* at 190:24–191:8.

---

[27]   Hall appears to indicate that she does yoga as "treatment," but admits that she did yoga before working for ROR. (Doc. # 52 at 190:24–191:5).

### a.    Intentional Infliction of Emotional Distress

In Kentucky, four elements must be met to make out a claim for intentional infliction of emotional distress: "[1] [t]he wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress[;] and [4] the distress suffered must be severe."  *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 459 (6th Cir. 2008) (alterations in original) (quoting *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000)).

Conduct only rises to the level of intentional infliction of emotional distress when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wad v. Amazon.Com Servs. Inc.*, 2:18-cv-97-DLB-CJS, 2020 WL 1066985, at *9 (E.D. Ky. Mar. 4. 2020) (quoting *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014)).  "Termination from employment, even if for discriminatory reasons, is insufficient to constitute outrageous conduct sufficient to support a claim for intentional infliction of emotional distress. *Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357, 368–69 (Ky. Ct. App. 2010); *see also Benningfield v. Pettit Envtl. Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005) ("Mere termination clearly does not rise to the level of outrageous conduct required to support an IIED claim.").  Thus, Hall cannot make out a claim for intentional infliction of emotional distress because her claim is based on ROR's termination of her, (Doc. # 52 at 189:14–190:1), which is not extreme or outrageous conduct, *Highlands Hosp. Corp.*, 323 S.W.3d at 368–69; *Benningfield*, 183 S.W.3d at

45

572.   Because termination from her position at ROR is not extreme or outrageous conduct, she cannot make out a necessary element of an intentional-infliction-of-emotional-distress claim, *see S.S.*, 532 F.3d at 459 (citing *Payne*, 31 S.W.3d at 913–14), so summary judgment is **granted**.  *See Celotex Corp.*, 477 U.S. at 322–23.

Moreover, in order "to meet the standard of severe emotional distress the injured party must suffer distress that is 'substantially more than mere sorrow.'"  *Barrios v. Elmore*, ___ F. Supp. 3d ___, 2020 WL 32326, at *12 (W.D. Ky. Jan. 2, 2020) (quoting *Bargo v. Goodwill Indus. of Ky.*, 969 F. Supp. 2d 819, 828 (E.D. Ky. 2013)).  "Distress that does not significantly affect the plaintiff[']s everyday life or require significant treatment" is not serious or severe under Kentucky law.  *Osborne v. Kenney*, 399 S.W.3d 1, 17 (Ky. 2012).  In fact, the Kentucky Supreme Court requires that "a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment."[28]  *Dickson*, 2019 WL 1412497, at *13 (quoting *Kenney*, 399 S.W.3d at 17–18); *see also Demetre*, 527 S.W.3d at 39 ("*Osborne* [*v. Kenney*]'s requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress.").  Hall claims that she has dealt with her emotional distress through yoga, which suggests that the stress is not so extreme that a

---

[28]   According to the Kentucky Supreme Court, there is a higher standard of proof to show severe distress when there are "free-standing" claims of "intentional or negligent infliction of emotional distress."  *Indiana Ins. Co. v. Demetre,* 527 S.W.3d 12, 39 (Ky. 2017).  That court has confirmed that the "heightened requirement of expert testimony to establish emotional damages" explained in *Kenney*, *id.* at 35 (discussing *Kenney*, 299 S.W.3d at 17–18), "is limited to claims of intentional or negligent infliction of emotional distress."  *Id.* at 39.  The Supreme Court was not completely clear what it meant by "free-standing claims" but based on the reasoning provided, the Kentucky Supreme Court appears to be explaining that alleged emotional distress damages arising from other torts do not have to be established through expert testimony, but in order to succeed on a separate claim of intentional or negligent infliction of emotional distress, expert testimony is required.  *See id.* at 35–40.  The only case by a Kentucky court interpreting and applying *Demetre*'s emotional-distress holding seems to confirm this.  *Dickson v. Shook*, __ S.W.3d ___, 2019 WL 1412497, at *13 (Ky. Ct. App. 2019).

"reasonable person . . . would not be expected to endure" it.  *Kenney*, 299 S.W.3d at 17. Moreover, no expert or medical proof is provided here to support Hall's allegation of severe emotional distress.  Thus, she is also unable to satisfy the fourth element of an intentional-infliction-of-emotional-distress claim.  *See S.S.*, 532 F.3d at 459 (citing *Payne*, 31 S.W.3d at 913–14).  Summary judgment is **granted** for this reason as well.  *See Celotex Corp.*, 477 U.S. at 322–23.

### b.      Negligent Infliction of Emotional Distress

In order to prove a claim for negligent infliction of emotional distress, the plaintiff must show the elements of negligence—"(1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury"—as well as showing the plaintiff suffered a "'serious' or 'severe' emotional injury."  *Kenney*, 399 S.W.3d at 17.

The requirements for showing a severe or serious emotional injury in the negligent-infliction-of-emotional-distress context are the same as in the intentional-infliction-of-emotional-distress context.  *See Dickson*, 2019 WL 1412497, at *13 (applying the holdings of *Kenney*, a negligent-infliction-of-emotional-distress case, in an intentional-infliction-of-emotional-distress case); *see also Demetre*, 527 S.W.3d at 39 (finding that the higher pleading standard applies to both negligent-infliction-of-emotional-distress and intentional-infliction-of-emotional-distress claims).   As the Court has found that Hall cannot meet the severity requirement in the intentional-infliction-of-emotional-distress claim, Hall can also not meet the severity requirement which is necessary for a negligent-infliction-of-emotional-distress claim.   Thus, summary judgment on the negligent-infliction-of-emotional-distress claim is similarly appropriate and is **granted**.  *See Celotex*

*Corp.*, 477 U.S. at 322–23.

### 9.    Public Policy

Hall also alleges that "Rag-O-Rama's conduct and termination of [her] was violative of public policy."  (Doc. # 6 at ¶ 47).  Hall appears to argue that her public-policy claims are supported by five alleged events: (1) ROR "demand[ing]" that Hall not use her "approved time off" and "not attend a family court hearing" in January of 2017, (2) ROR "demand[ing] . . . that she cancel her upcoming vacation and immediately go to the Columbus store," (3) ROR "retaliat[ing] [against Hall] based upon her refusal to be manipulated into forfeiting [her employment benefits including time off]," (4) ROR "retaliat[ing] against Ms. Hall when she refused Mr. Whitener's directions to lie about an employee who was fired in order to discipline managers," and (5) ROR "l[ying] by omission when [ROR] withheld material concerns about her ability to perform the job while simultaneously encouraging her to resign her secure (8 years) position with Elizabeth Cole."  (Doc. # 64 at 21).  Hall cites no legal authority or evidence in the record in support of her claim.  In her deposition, however, Hall alternatively claims that the basis of the public-policy claim is that ROR fired her without cause and contested her unemployment benefits.  (Doc. # 52 193:17–25).

### a.    Wrongful Discharge

Based on Hall's allegation and subsequent deposition testimony, it appears that she is attempting to bring a claim under Kentucky law for wrongful discharge in violation of public policy.  As the Court has previously noted, an employer can discharge an at-will employee "for good cause, for no cause, or for a cause that some might view as morally indefensible."  *Greissman*, 571 S.W.3d at 566 (quoting *Asbury Univ.*, 486 S.W.3d at 262).

There is, however, a narrow public-policy exception to Kentucky's "'terminable-at-will' doctrine" known as wrongful discharge, which applies when "the firing of an employee undermined a 'most important public policy.'"  *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010) (quoting *Firestone*, 666 S.W.2d at 734); *see also Greissman*, 571 S.W.3d at 566.

"To establish a cause of action for wrongful discharge, an employee must show that the termination was contrary to public policy evidenced by a constitutional or statutory provision, or that the discharge directly resulted from the employee's refusal to violate the law during the course of his employment."  *Greissman*, 571 S.W.3d at 566 (citing *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985); *Firestone*, 666 S.W.2d at 733).  In other words, there are only two "situations in which discharging an at-will employee would be so contrary to public policy as to be actionable despite the absence of 'explicit legislative statements prohibiting the discharge.'"  *Hill*, 327 S.W.3d at 422 (quoting *Gryzb*, 700 S.W.2d at 402); *see also Alexander v. Eagle Manufacturing Co., LLC*, 714 F. App'x 504, 507 (6th Cir. 2017) (explaining that if there are not "statutes expressly prohibiting [plaintiff's] discharge" then the "wrongful-discharge claim must fit into one of the two public-policy exceptions" enumerated in *Grzyb*).  The two situations are as follows: "1) Where the alleged reason for discharge of the employee was the employee's failure or refusal to violate a law in the course of employment; or 2) When the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment."  *Hill*, 327 S.W.3d at 422 (citing *Gryzb*, 700 S.W.2d at 402).  Whether termination violated public policy is a question of law reserved for the Court.  *Shrout v. The TFE Group*, 161 S.W.3d 351, 354 (Ky. Ct. App. 2005).

Here, Hall has not shown that her termination violated public policy.  She has not shown any legislative provision which explicitly prohibited her firing, nor has she alleged that she was fired for refusing to do something illegal or for exercising a *legislatively protected* right.[29]  "[E]ven if Plaintiff 'may have believed that Defendant['s] actions were violations of Kentucky law . . . [her] subjective belief does not determine whether an action is one that is violative of public policy.  Plaintiff must put forth evidence that the Defendant['s] actions were in fact violations of Kentucky law.'"  *Smith v. LHC Group, Inc.* No. 5:17-cv-15-KKC, 2019 WL 6702423, at *9 (E.D. Ky. Dec. 9, 2019) (second alteration in original) (quoting *Chavez v. Dakotta Integrated Sys.,* LLC, 832 F. Supp. 2d 786, 803 (W.D. Ky. 2011)).  She has not done so.  Thus, Hall has not met her burden of putting forth sufficient evidence from which a jury could find that she has met all of the elements of a wrongful-discharge claim, so summary judgment must be **granted**.  *See Celotex Corp.*, 477 U.S. at 322–23; *see also Cole v. Roeder Cartage Co.*, No. 5:10-cv-403-JBC, 2012 WL 208089, at *2 (E.D. Ky. Jan. 24, 2012) (granting summary judgment on a wrongful-discharge claim when plaintiff failed to identify any law prohibiting discharge, and did not allege his refusal to violate the law or his exercise of a legislatively-protected right led to discharge).

### b.    Other Conduct

Based on the arguments in her brief responding to the summary-judgment Motion and some of her deposition testimony, it appears that Hall is attempting to argue that some of ROR's other conduct prior to her termination violated public policy.  Additionally,

---

[29]    Hall seems to allude to an allegation that her firing was retaliation for her attempt to use her paid-time-off benefits; however, this is not clear.  (Doc. # 64 at 21).  Even if this was what she is attempting to argue, Hall still hasn't pointed to a legislatively-protected right to use her time off in this way without interference by ROR.

it appears that ROR understood some of the allegations in Hall's complaint to allege public-policy violations based on other conduct.  (Doc. # 53 at 30–31) (discussing that the contest of Hall's unemployment benefits did not violate public policy).  In the employment-context, however, public-policy claims in Kentucky appear to only be for wrongful termination.  Plaintiff has not pointed to any legal authority providing relief for alleged public-policy violations arising out of other conduct.  *See* (Doc. # 64 at 21).  The Court is unaware of authority in Kentucky that would allow for such relief.  To the extent Plaintiff alleges a claim based on conduct other than her termination, summary judgment is **granted** on that claim.

### 10.    *Punitive Damages*

In her Amended Complaint, Hall alleges that ROR's conduct was "extreme, outrageous, . . . unconscionable, . . . intentional, willful, . . . done in reckless disregard of Hall's legal rights, . . . done with oppression, fraud, malice, . . . reckless indifference, and otherwise in bad faith."  (Doc. # 6 at ¶ 43–45).  She also alleges that ROR's "conduct and termination of Hall was intentional, negligent, grossly negligent, [and] unlawful."  *Id.* at ¶ 48.  Her brief does not specifically explain the grounds for each of these claims.  *See* (Doc. # 64).  When asked about each alleged claim during her deposition, Hall did not identify specific legal claims each allegation was intended to represent.  *See* (Doc. # 52 at 182:7–189:8, 195:14–18) (explaining that the circumstances underlying most claims were previously discussed during her deposition, that ROR was generally indifferent about her job performance, and going into detail about how she was allegedly required to lie about the reason someone was fired which she claimed was malicious).  In other words, based on both the brief and deposition testimony, it is not clear what legal claim(s)

Hall is attempting to bring with these general allegations compiling various legal standards.

Reading these various statements generously, it appears that Hall may be trying to lay the groundwork for a punitive-damages claim. Punitive damages are awarded in Kentucky when a "plaintiff proves by clear and convincing evidence that a defendant acted with fraud, oppression, or malice [or] . . . if gross negligence is shown." *Yung*, 563 S.W.3d at 65 (citing *Williams v. Wilson*, 972 S.W.2d 260, 626–65 (Ky. 1998)). Punitive damages, however, are only awarded for other tort violations; a claim for punitive damages "is not an independent cause of action." *Price v. AgriLogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014); *see also Smith v. Westlake Vinyls, Inc.*, 403 F. Supp. 3d 625, 635–36 (W.D. Ky. 2019). Thus, to the extent that Hall is attempting to bring such a separate punitive-damages claim, summary judgment must be **granted** as such a claim is not actionable in Kentucky.

### *11.   Unemployment Benefits*

Plaintiff's brief in response to the summary-judgment Motion seems to suggest a claim based on ROR's alleged "malicious attempt to deny [Hall] unemployment benefits." No such claim, however, is pled in the Amended Complaint. *See generally* (Doc. # 6). Only one paragraph in the entire Amended Complaint mentions Hall's unemployment benefits. *Id.* at ¶ 33 ("Rag-O-Rama improperly contested Hall's claim for unemployment compensation thereby causing unnecessary delay in receiving the benefits that she was eventually awarded."). More importantly, the "Causes of Action" section of the Amended Complaint does not suggest a claim related to Hall's unemployment benefits. All but one of the paragraphs in this section deals exclusively with ROR's "conduct and termination

of Hall." *Id.* at ¶¶ 36–48.  This language seems to suggest that the claims are based on ROR's conduct prior to termination of Hall and the actual termination of Hall; it does not clearly suggest a claim based on post-conduct termination of ROR.  The only paragraph not using the "conduct and termination" language simply alleges that ROR's "actions" were intentional, willful, and done in reckless disregard of Hall's legal rights.  *Id.* at ¶ 44. Again, there is no mention of post-termination conduct, or specifically a claim based on Hall's unemployment benefits.  The Amended Complaint does not give adequate notice of a claim based upon ROR's alleged contest of Hall's unemployment benefits.  Given this, it appears that Hall is attempting to raise a new cause of action in response to a summary-judgment motion.

The Sixth Circuit has continually held that a plaintiff cannot bring new claims in response to a summary-judgment motion.  *Tchankpa*, 951 F.3d at 817; *Woody v. Aurora Commercial Corp.*, 779 F. App'x 348, 353 (6th Cir. 2019) (citing *Tucker*, 407 F.3d at 788). A "complaint must contain 'a short and plain statement of the claim that will give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Tchankpa*, 951 F.3d at 817 (quoting *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001)).  Hall's claim fails here.  From ROR's Motion, it appears that ROR understands Hall's unemployment benefit allegations to be part of her public-policy claim, not a separate cause of action.  (Doc. # 53 at 30–31).  In response, however, Hall appears to claim that the attempted denial of unemployment benefits is "well-supported and legally actionable" as a separate claim.  (Doc. # 64 at 19).  Bringing a new claim at this point, however, would "subject defendants to unfair surprise."  *Tucker*, 407 F.3d at 788 (citing *Guiffre v. Local Lodge No. 1124*, No. 90-3540, 1991 WL 135576, at *5 (6th Cir. July 24,

1991); *E.E.O.C.*, 246 F.3d at 854.  Accordingly, the Court will not consider this new claim grounded in alleged issues with Hall's unemployment benefits.

## III.   CONCLUSION

In sum, ROR's Motion for Summary Judgment (Doc. # 53) is **granted in part** and **denied in part**.  Accordingly, the following claims that Hall appears to bring against ROR are dismissed: breach of contract, breach of company policy and procedure, breach of representations and warranties, breach of fiduciary duty, detrimental reliance/promissory estoppel, fraudulent inducement as to the alleged promise of job security, tortious interference in a contractual relationship, intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful discharge/public policy, and punitive damages.  Hall's fraudulent-inducement claim as to the alleged promise of $5000, a company car, and an ownership interest in ROR remains.

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)   Defendant Rag-O-Rama's Motion for Summary Judgment (Doc. # 53) is **GRANTED IN PART** and **DENIED IN PART**;

(a)   The Motion is **GRANTED** as to the following claims: breach of contract, breach of company policy and procedure, breach of representations and warranties, breach of fiduciary duty, detrimental reliance/promissory estoppel, fraudulent inducement based on the alleged promise of job security, tortious interference in a contractual relationship, intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful discharge/public policy, and punitive damages; and

      (b)    The Motion is **DENIED** as to Hall's fraudulent-inducement claim based on the alleged promises of $5000, a company car, and an ownership interest in ROR.

(2)    A **Telephonic Status Conference** will be held in this matter on June 5, 2020 at 1:00 p.m.  The parties must **dial in** to this conference **at least five minutes in advance of the scheduled time** by following these steps:

      (a)    Call AT&T Teleconferencing at **1-877-336-1839**; and

      (b)    Enter access code **8854898**.

This 5th day of May, 2020.

Signed By:

*David L. Bunning*

United States District Judge

J:\DATA\ORDERS\Cov2018\18-12 MSJ MOO.docx